DA 23-0669

FILED

12/03/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0669

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 292

CITY and COUNTY OF BUTTE-SILVER BOW,
MONTANA,

      Applicant and Appellant,

  v.

BUTTE POLICE PROTECTIVE ASSOCIATION,

      Respondent and Appellee.

APPEAL FROM:   District Court of the Second Judicial District,
                  In and For the County of Butte-Silver Bow, Cause No. DV 21-302
                  Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Cynthia L. Walker, Elliott D. McGill, Boone Karlberg P.C., Missoula,
           Montana

      For Appellee:

           Nate McConnell, McConnell Law Offices, PLLC, Missoula, Montana

Submitted on Briefs:  August 28, 2024

Decided:  December 3, 2024

Filed:

_____
                    Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 The City and County of Butte-Silver Bow, Montana, (BSB) appeals the decision of the Second Judicial District Court, Butte-Silver Bow County, denying its M. R. Civ. P. 60(b) motion to vacate an arbitrator's award. The arbitrator ruled in favor of the Butte Police Protective Association (BPPA), on behalf of Rhonda Staton (Staton). We affirm in part and reverse in part.

¶2 We address the following issue on appeal:

> *Whether the District Court abused its discretion in denying BSB's M. R. Civ. P. 60(b) motion for relief from a judgment that denied BSB's motion to vacate the arbitrator's award and remanded the matter to the arbitrator to fashion an appropriate remedy.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On December 10, 2001, BSB hired Staton as a police officer. She performed her assigned duties in that role from 2001 until her promotion to detective in July 2008. Because BSB does not do annual performance reviews of employees, the record contains no indication Staton failed to perform her job duties adequately between 2001 and 2017.

¶4 In 2017, Staton was issued a verbal reprimand for tardiness. This verbal reprimand was the only instance of Staton falling short of being "a positive example" for less senior officers as she had "been in the past." No other instances of deficiencies in her work existed until this point.

¶5 Sheriff Ed Lester (Lester) issued a second verbal reprimand to Staton on September 5, 2018, for her refusal to investigate underage drinking at a high school football

2

game.  Lester placed a written record of this verbal reprimand in Staton's file for six months and removed the record of the verbal reprimand by March 5, 2019.

¶6     In November 2018, Captain George Holland (Holland) discovered four boxes of case files assigned to Staton in the basement of the law enforcement center.  Lester and Holland met with Staton to discuss the misplaced files in January 2019.  During this meeting, Lester asked Staton if she felt she could continue her work in the detective division.  Staton admitted to feeling overwhelmed.  She expressed a possible desire to transfer back to her original patrol position.  Lester advised her that she had been a "successful detective in the past" and that he believed she could stay in the detective division.  He additionally told her that "most detectives feel overwhelmed at times" and that taking a "few days to think" might improve her perspective.  Lester did not take any disciplinary action against Staton for the misplaced files.

¶7     In 2019, Staton made a hostile work environment complaint to the BSB Human Resources department.  BSB concluded its investigation into Staton's claims by the end of that year.  The results did not substantiate Staton's claims, but did note the coworker "accused of uncomfortable and violent behavior apologized to [Staton]."  Instead, the investigation concluded that Staton was at times "hypersensitive," a condition exacerbated by "less than optimal communications between involved parties and the injection of emotional feelings" which led to "actions by others being magnified out of proportion to the message intended."  Staton was disappointed by the investigation's final report.  In a letter to the BSB Personnel Director following the conclusion, Staton wrote she was

3

"barely functioning" in the workplace because of what she felt was a lack of resolution of the issues she alleged. Lester recalled receiving a phone call from Staton in which she sounded "clearly distraught" over the outcome. He believed she may have been crying.

¶8 Despite Staton's struggles with the job, until January 2020, Staton had not been suspended or otherwise disciplined aside from the two verbal reprimands. Contemporaneous notes on Staton's mental well-being were kept not only by Lester, but also by other officers of the detective division, including Sergeant Ray Vaughn, Detective Sergeant Jeff Williams, and Holland. None of those written notes were discipline for performance issues and none were included in Staton's personnel file. All, however, contained concerns for her mental health.

¶9 In early 2020, Lester learned Staton had lost her department-issued taser. On February 19, 2020, Lester again called a meeting with Staton, during which Lester expressed concern for Staton's mental health. While discipline for the performance issues "was likely," according to Lester, his primary concern was for Staton's "well-being." Lester ordered Staton to undergo a Fit for Duty Evaluation (FFDE) and placed her on paid administrative leave pending the outcome of the examination. Nonetheless, Staton was still not disciplined for any issues related to her job performance.

¶10 Dr. George W. Watson (Watson), a licensed psychologist, conducted the FFDE to determine if Staton met the requirements applicable to a new hire. Based on the results of the tests, Watson found that Staton did not present as "a well-grounded, psychologically-emotionally stabilized individual" warranting "a positive new-hire

4

recommendation." Watson's report did not, however, ascribe any particular diagnosis to Staton's condition nor did Watson determine whether her condition was temporary or permanent.

¶11 Watson delivered his report to Lester on April 27, 2020. Despite the FFDE finding Staton was not fit for duty, BSB kept Staton on paid administrative leave for an additional four months. On July 27, 2020, Lester informed Staton of his intent to terminate her employment based on the results of Watson's evaluation and Staton's performance issues between 2018 and 2020. Lester then proceeded to terminate Staton's employment on August 24, 2020, on the grounds that Staton's lack of fitness for duty required she forfeit her position as a peace officer as provided by Montana law.

¶12 On September 3, 2020, Staton's union, BPPA, filed a grievance on her behalf against BSB challenging the termination. BSB and BPPA engaged in the grievance process throughout the month of September, but by October 7, 2020, the issue remained unresolved and, pursuant to the BSB-BPPA Collective Bargaining Agreement (CBA), the matter proceeded to arbitration. BPPA and BSB submitted the issue of whether BSB had good cause to terminate Staton's employment to Arbitrator A. Ray McCoy (McCoy) in April 2021.

¶13 After two days of virtual hearings, McCoy issued his opinion and award on August 9, 2021, finding that the performance issues preceding Lester placing Staton on paid leave alone did not require an FFDE. Nevertheless, McCoy found that the concerns for Staton's mental well-being shared by Lester and other officers warranted intervention.

¶14    McCoy's opinion focused on Article 13, Section 5, of the CBA and BSB Policy 302. Article 13, Section 5, acknowledges the behavior health problems inherent to police work. McCoy interpreted this to require BSB to consider and prioritize rehabilitation for employees experiencing health issues. Policy 302 requires BSB to convene a board of review to evaluate concerns related to an employee's inability to fulfill professional duties due to mental health issues. The board of review makes the final determination of whether the officer is qualified for continued employment. BSB did not convene such a board.

¶15    McCoy found Watson's FFDE report unreliable and insufficient to justify termination of Staton's employment. First, McCoy found Watson's comparison of Staton, an 18-year veteran, to a new hire an inappropriate standard by which to measure Staton's condition. Second, McCoy took issue with Watson's simultaneous dismissal of Staton's workplace concerns and his use of the results of BSB's investigation into those claims to conclude that Staton "took no responsibility for her work performance and as a result was not fit for duty." McCoy, while acknowledging that he was not tasked with determining "whether those actions rise to the level of harassment or discrimination," understood "these examples as real indicators that Detective Staton did and may continue to experience workplace conduct that produces stress and impacts her performance." Third, McCoy also found Watson "failed to identify any particular malady with which [Staton] was struggling." As evidence of Watson's "rampant" speculation, McCoy pointed to the following passage in Watson's FFDE:

> [Staton] intentionally gave responses to paint a very negative picture of herself. Sometimes, individuals want to 'look bad,' deficient in some way. . . . If she did, paint a negative picture of herself, then any such attempt would be considered as malingering. Such a conclusion would also not warrant a positive recommendation.

McCoy took umbrage with Watson's report, finding the evaluator created "out of thin air the notion that Detective Staton lied on the personality inventories in an attempt to make herself look bad and be declared unfit for duty." McCoy found "simply no evidence to support that conjecture." McCoy determined that Watson's report "must be rejected as completely unreliable support for [BSB]'s discharge decision."

¶16 McCoy found Watson's report failed to sufficiently establish the true nature of Staton's condition. Therefore, Lester could not use Watson's report "to satisfy the requirement imposed upon him by Policy 302." Because Lester did not comply with the Policy 302 mandate to evaluate Staton's inability to comply with her professional duties due to a mental health condition, BSB had failed to establish just cause to terminate Staton.

¶17 Dr. John Nicoletti (Nicoletti), a police psychologist, provided additional analysis of Watson's FFDE as an arbitration witness for BPPA. Importantly, Nicoletti did not evaluate Staton, he only reviewed Watson's report. Nicoletti agreed that Staton's performance issues warranted an FFDE and that, based on only Watson's evaluation, she was not fit for duty. During arbitration, Nicoletti testified that BSB had made "a critical error" by adopting Watson's opinion and terminating Staton without giving her the opportunity to seek rehabilitation. According to Nicoletti, BSB should have provided Staton with Watson's report once it was available, informed her that management agreed with or was

7

adopting Watson's report, and "then allowed [Staton] reasonable time to seek medical care so that she . . . had an opportunity to . . . get herself fit for duty." Nicoletti claimed this was "standard practice in fitness for duty examinations." This testimony was "un-contradicted" during arbitration. Instead, BSB delayed issuing a termination letter to Staton until four months after Watson delivered his report. During that time, BSB provided no rehabilitative services or other guidance to Staton. McCoy found that this delay not only contradicted the best practices espoused by Nicoletti but importantly violated BSB's policies to prioritize rehabilitation and to make "every effort" to assist a struggling employee.

¶18 In the arbitrator's award, McCoy sustained BPPA's grievance finding BSB had dismissed Staton without cause. His award ordered:

> [BSB] will immediately reinstate Detective Staton and make her whole for all lost wages and benefits from the date her paid leave ended. [BSB] will restore all of Detective Staton's rights associated with her status as detective including the right to elect to return to the patrol division should she choose to do so. [BSB] will also provide an evaluation of Detective Staton's psychological and mental health in an effort to determine what rehabilitative strategies might be available to her as called for in the [CBA]. In short, [BSB] must make every effort to assist Detective Staton through her difficult psychological and emotional challenges.

As per the stipulation of the parties, McCoy retained jurisdiction to assist with the implementation of the award.

¶19 BSB did not reinstate Staton or compensate her for back pay and benefits. BSB did arrange for Staton to undergo an Independent Medical Evaluation (IME) with Dr. William Patenaude (Patenaude) on November 2, 2021. During their three hour meeting, Patenaude

8

"emphasized to Ms. Staton that this was not a Fit for Duty Examination." Patenaude's IME reached no diagnosis for Staton's condition and made "no recommendations for rehabilitative strategies that might be available to . . . help her to meet the qualifications for employment as a law enforcement officer." Patenaude found Staton struggled with self-reflection and accountability, partly to "mask a fundamental sense of vulnerability and inadequacy." She attributed her "negative work environment" to "factors outside her control." Patenaude found this "apparent lack of insight may be related to a number of factors, including characterological factors and ongoing litigation" against BSB by Staton.[1] During the IME, Staton expressed a willingness to attend therapy.

¶20    BSB timely petitioned to vacate the award on the grounds that McCoy had manifestly disregarded Montana law. The District Court issued its order on July 28, 2023, denying the motion to vacate in part and in part remanding the matter back to McCoy to reconcile "the initial arbitration award, Staton's inability to return to service, and the additional fitness for duty evaluation completed after the arbitration." BSB then filed a motion for relief from the order pursuant to M. R. Civ. P. Rule 60(b)(6). After 60 days with no action from the District Court, the motion was deemed denied as a matter of law. BSB now appeals.

---

[1] Staton has pursued separate litigation against both BSB and Watson. Neither of those causes are before us today.

**STANDARD OF REVIEW**

¶21 "A district court's review of an arbitration award is strictly limited by Montana's Uniform Arbitration Act (UAA)." *Tedesco v. Home Savings Bancorp, Inc.*, 2017 MT 304, ¶ 11, 389 Mont. 468, 407 P.3d 289 (citing *Paulson v. Flathead Cons. Dist.*, 2004 MT 136, ¶ 24, 321 Mont. 364, 91 P.3d 569; *Geissler v. Sanem*, 285 Mont. 411, 415, 949 P.3d 234, 237 (1997)). After a matter has been submitted to binding arbitration, district courts "are not permitted to review the merits of the controversy, but may only confirm, vacate, modify, or correct an arbitration award pursuant to §§ 27-5-311, -312, and -313, MCA." *Teamsters Union Local No. 2, Int'l Bhd. Of Teamsters v. C.N.H. Acquisitions, Inc.*, 2009 MT 92, ¶ 14, 350 Mont. 18, 204 P. 3d 733. District courts "do not sit to hear claims of factual and legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers Intl. Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S. Ct. 364, 370-71 (1987). Thus, a district court is afforded no discretion in its decision to confirm or vacate the award of an arbitrator due to the strict limitations of the UAA.

¶22 "The U.S. Supreme Court has held that 'courts of appeals should apply ordinary, not special, standards' when reviewing district court decisions on arbitration awards; a decision on an arbitration award should be reviewed like 'any other district court decision . . . accepting findings of fact that are not clearly erroneous but deciding questions of law de novo.'" *City of Livingston v. Mont. Pub. Emp. Ass'n ex rel. Tubaugh*, 2014 MT 314, ¶ 11, 377 Mont. 184, 339 P.3d 41, (quoting *First Options, Inc. v. Kaplan*, 514 U.S. 938, 947-48, 115 S. Ct. 1920, 1926 (1995)). Hence, our review of a district court's

conclusions of law is de novo, and any necessary findings of fact are reviewed for clear error.

¶23 A district court's decision to grant or deny a Rule 60(b) motion is reviewed for abuse of discretion. *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶ 16, 338 Mont. 423, 166 P.3d 451. "The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *Jarvenpaa v. Glacier Elec. Co-op, Inc.*, 1998 MT 306, ¶ 13, 292 Mont. 118, 970 P.2d 84. A district court also abuses its discretion if it makes an "erroneous conclusion or application of law . . . ." *In re Marriage of Bessett*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894 (quotation omitted). When reviewing a district court's confirmation of an arbitration award for abuse of discretion, this Court "cannot review the merits of the controversy, but may only confirm, vacate, or correct an arbitration award." *Tedesco*, ¶ 12 (citing §§ 27-5-311, -312, and -313, MCA; *Roberts v. Lame Deer Pub. Sch. Dist. No. 6*, 2013 MT 358, ¶ 7, 373 Mont. 49, 314 P.3d 647).

## DISCUSSION

¶24 BSB contends that the District Court abused its discretion in failing to vacate the arbitrator's award as a manifest disregard of the law. Vacatur, BSB argues, is required because reinstatement of Staton, as ordered by the arbitrator, irreconcilably contradicted Montana law governing fitness for duty of peace officers.

¶25 Conversely, BPPA argues that the Arbitrator's award comports with Montana law governing fitness for duty of peace officers because the Arbitrator dismissed the evaluation

11

by Dr. Watson as unreliable and ordered an additional evaluation by another mental health professional. McCoy fashioned his award based on his understanding that the CBA conferred a mandatory obligation on BSB to "assist Detective Staton through her difficult psychological and emotional challenges."

¶26 A collective bargaining agreement is "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S. Ct. 1347, 1351 (1960). A collective bargaining agreement represents the parties' agreement to choose an arbitrator as their "officially designated reader of the contract," who will provide the "means through which they agree to handle the anticipated unanticipated omissions of the [collective bargaining agreement]." *Stead Motors of Walnut Creek v. Automative Machinists Lodge No. 1173*, 886 F.2d 1200, 1205 (9th Cir. 1989). The arbitration award is an expression of the will of the parties and is therefore afforded a "nearly unparalleled degree of deference." *Stead Motors*, 886 F.2d at 1205. When an arbitrator interprets the collective bargaining agreement, "he is speaking for the parties, and his award is their contract." *Stead Motors*, 886 F.2d at 1205. If the award is based on the arbitrator's interpretation of the collective bargaining agreement, a court may not disturb the award even if it believes the arbitrator's interpretation of the contract to be factually or legally in error. *Terra W. Townhomes, LLC v. Stu Henkel Realty*, 2000 MT 43, ¶ 37, 298 Mont. 344, 996 P.2d 866.

¶27 Montana follows these principles and "gives arbitrators broad authority and powers to determine all issues," including "issues of law and fact." *Paulson*, ¶¶ 22-23. "As long as an arbitrator's factual determination and legal conclusions derive their essence from the collective bargaining agreement itself and the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced." *Livingston*, ¶ 15 (citing *Sheet Metal Workers Int'l Ass'n., Local No. 359 v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir. 1988)); *see also Teamsters*, ¶ 22.

¶28 Accordingly, district courts are restricted from re-weighing or reinterpreting "the reliability of evidence presented for the arbitrator's consideration." *Livingston*, ¶ 32; *see also Stockade Enter. v. Ahl*, 273 Mont. 520, 524, 905 P.2d 156 (1995); *May v. First Nat. Pawn Brokers, Ltd.*, 269 Mont. 19, 26-27, 887 P.2d 185, 191 (1994). Montana law thus limits grounds for vacating an award *inter alia* to "evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party." Section 27-5-312(1)(b), MCA. Evident partiality and misconduct on the part of the arbitrator includes manifest disregard for the law. *Geissler*, 285 Mont. at 416, 949 P.2d at 237-38. Manifest disregard of the law requires that the arbitrator was aware of a clearly governing principle of Montana law and blatantly refused to follow it. *Geissler*, 285 Mont. at 416, 949 P.2d at 237-38.

¶29 The CBA at issue here provides that BSB and BPPA "agree and recognize that the Law Enforcement Department is subject to the regulations of the Metropolitan Police Law of the State of Montana as set forth in Title 7, Chapter 32, Part 41." In accordance with

the policy behind collective bargaining agreements and the concomitant narrow review of an arbitration award by a district court, § 7-32-4164, MCA, provides:

> A member of the police force who is disciplined, suspended, removed, or discharged . . . has a right of appeal:
> (1)     pursuant to the terms of a grievance procedure contained in a collective bargaining agreement if the member is covered by a collective bargaining agreement . . . .

If the officer is not covered by a collective bargaining agreement, then the appeal is to the police commission, with any final decision of the police commission appealable to the district court.  Butte-Silver Bow, Mont. Mun. Code § 2.24.130 (2007), in like fashion, provides:

> A member of the law enforcement department who is disciplined, suspended, removed, or discharged as a result of a decision by the sheriff has a right of appeal . . . pursuant to the terms of a grievance procedure contained in a collective bargaining agreement, if the member is covered by a collective bargaining agreement.

¶30     Section 7-32-303(2)(g), MCA, is also relevant to these proceedings and provides that "a peace officer must: . . . (g) be free of any mental condition that might adversely affect performance of the duties of a peace officer . . . ."  Should a peace officer fail to meet any of the requirements set forth in § 7-32-303, MCA, including meeting the requirements of peace officer certification promulgated by the Montana Public Safety Officer Standards and Training Council (POST),[2] that officer "forfeits the position, authority, and arrest powers accorded a peace officer in this state."

---

[2] Established by § 2-15-2029, MCA, POST implements the provisions of Title 44, Chapter 4, part 4, MCA.

14

¶31 Thus, in addition to and apart from the CBA and Title 7, Chapter 32, part 41, POST has a duty to "provide for the certification and recertification of public safety officers and for the suspension or revocation of certification of public safety officers." Section 44-4-403(1)(c), MCA. POST may deny, sanction, suspend, or revoke a peace officer's certification if the officer has "a mental condition that substantially limits the officer's ability to perform the essential duties of a public safety officer, or poses a direct threat to the health and safety of the public or fellow officers, and that has not been or cannot be eliminated or overcome by reasonable accommodation provided by the appointing authority." Admin. R. M. 23.13.702(3)(b) (2024). Section 44-4-403(3), MCA, as relevant here, provides that "[t]he council may not revoke a public safety officer's certification solely on the basis of a public safety officer's mental illness unless, due to the mental illness, a physical or mental conditions exits that, even with reasonable accommodations:" limits the officer's ability to perform duties of the job or poses "a direct threat to the health and safety of the public or fellow public safety officers."

¶32 We previously considered in *Livingston* the interplay of these statutes and the UAA within the context of terminating a peace officer who was purportedly unfit for duty due to mental health reasons. *Livingston* is nearly indistinguishable from these proceedings. In *Livingston*, this Court considered whether an arbitrator's award ordering the reinstatement of a peace officer who had "episodes of inappropriate anger and aggressive behavior" violated public policy. *Livingston*, ¶ 27. The arbitrator in that case similarly rejected a mental health evaluation—also performed by Watson—as too methodologically flawed to

15

conclusively prove the officer's unfitness for duty.  *Livingston*, ¶ 30.  Pointing to a police department's "undisputed duty to protect the public," the district court vacated an arbitrator's award to reinstate the peace officer after concluding that reinstatement was a violation of a "generalized public policy against a particular sort of behavior."  *Livingston*, ¶¶ 27-28 (internal citation omitted).  We reversed the district court.  We held that the district court's vacatur of the arbitrator's award as a supposed violation of public policy "impermissibly substituted the Arbitrator's factual determinations for its own" by finding the officer was unfit for duty when the arbitrator had not.  *Livingston*, ¶ 28.  We explained:

> Here, the Arbitrator's reasoning involved her interpretation of the CBA's provisions for discipline and termination, matters properly within the scope of the issue presented by the parties for arbitration: whether there was cause for termination.  Even if the Arbitrator's reasoning involved errors of fact and law, her award is limited to that issue.  The District Court found error in the Arbitrator's interpretation of the CBA.  A court may not overturn an arbitrator's decision, however, "simply because the court believes its own interpretation of the contract would be the better one."  *W. R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 764, 103 S. Ct. 2177, 2182 (1983).

*Livingston*, ¶ 21.

¶33    Our decision in *Livingston* did not turn on determining whether the officer was fit for duty but instead on affirming the arbitrator's authority to interpret a collective bargaining agreement.  Just as here, the arbitrator in *Livingston* had rejected the only psychological evaluation performed and, absent other evidence, found the employer had not established sufficient grounds for terminating the employee.  *Livingston*, ¶ 30.  Without further evidence, the arbitrator concluded the employer had "failed to attempt to reform [the officer's] behavior" prior to termination, which was in violation of the CBA.

16

*Livingston*, ¶ 18. Here, Arbitrator McCoy fashioned his final award based upon the CBA and employment policies governing the relationship between BPPA and BSB. His plausible interpretation of that agreement conferred on BSB an affirmative duty to provide mental health services to peace officers pursuant to Article 13, Section 5, of the CBA and BSB Policy 302. BSB cannot establish good cause under the CBA to terminate a peace officer without complying with these CBA policies.

¶34 BSB's related argument that the arbitrator's award violated public policy is likewise disposed of based on our decision in *Livingston*. Absent evidence of Staton's inability to perform her duties as a peace officer, there was no good cause to terminate her. Affirming an award that found the only evidence of Staton's mental health was unreliable and not credible does not violate public policy. Moreover, following the terms of a collective bargaining agreement *is* good policy as "[i]t is necessary for the high morale of police officers and to the efficient operation of police departments to provide an alternative, expeditious, and effective procedure for the resolution of labor disputes through binding arbitration." Section 39-31-504, MCA.

¶35 BSB argues that § 7-32-303(2)(g), MCA, bars Staton's continued employment stemming from her ongoing mental health issues. Arbitrator McCoy's award did not arrive at a contrary conclusion. McCoy clearly considered this provision of Montana law in his opinion, and he did not blatantly disregard § 7-32-303(2)(g), MCA. Rather, he found that the statute proffered by BSB as prohibiting Staton's reinstatement in fact confers a duty on BSB, as the employer of peace officers, to remove unqualified officers from the field.

17

McCoy's conclusion that BSB had this duty was correct: "a public safety officer's appointing authority" has the responsibility "to apply the employment standards" and "terminat[e] the employment of a public safety officer for failure to meet the minimum standards established by [POST]." Section 44-4-404(1), MCA. While POST has concurrent authority with Staton's appointing authority—BSB—to revoke an officer's certification, the record indicates that at no point was POST involved in Staton's case. Section 44-4-403(1)(c), MCA. The process regarding allegations of an officer failing to meet the minimum POST requirements are well articulated under Admin. R. M. 23.13.703 (2024).

¶36 The process of removing an officer who does not meet POST standards is nonetheless governed by the CBA, not the statute. Section 7-32-303(5), MCA. A discharged officer has a right to appeal "pursuant to the terms of a grievance procedure contained in a collective bargaining agreement if the member is covered by a collective bargaining agreement." Section 7-32-4164, MCA. BSB's compliance with the CBA in terminating Staton was precisely the question before Arbitrator McCoy. Not only did McCoy find the evidence presented by BSB justifying the termination of Staton's employment not reliable enough to merit her termination, but he also found that Lester failed to convene the compulsory review board pursuant to BSB Policy 302 to determine whether Staton could possibly return to active duty. Lester may have been conferring with the various members of his department who likely would have sat on such a review board, but informal discussions with Staton's peers and supervisors were a wholly inappropriate substitute for the established procedure.

18

¶37 The District Court found no errors in Arbitrator McCoy's application of the facts before him to the language of the CBA. We agree. Here, BSB has failed to demonstrate that Staton's mental condition required her termination. While troubling, the concerns voiced by various members of her department never evolved into formal discipline. Crucially, McCoy found Watson's FFDE—the only investigation into Staton's condition conducted by BSB—completely unreliable. The statutory requirements for finding an officer unfit for duty had not been met and thus no explicit conflict exists with the peace officer fitness requirements under § 7-32-303(2)(g), MCA. Indeed, McCoy's award ordered BSB to provide an additional evaluation of Staton's psychological and mental health precisely to ensure Staton could meet the qualification standards of §7-32-303(2)(g), MCA, and to rectify deficiencies in BSB's initial termination process resulting from Lester and other supervisors failing to follow internal procedures. Having discarded Watson's evaluation as unreliable—a finding particularly to be made by the arbitrator under the UAA and our precedent—there was no other evidence establishing good cause as required by the CBA to terminate Staton.

¶38 At the time of her termination, Staton was on paid administrative leave. In fact, Staton was on paid administrative leave for four months between when Watson's FFDE found she was unfit for duty and her termination by BSB in August 2020. Reinstating Staton to this status pending the outcome of further evaluations as ordered by the arbitration award comports with McCoy's particular sensitivity to Staton's condition and its impact on her ability to maintain certification as a police officer. McCoy did not find Staton fit

19

for duty—McCoy found deficiencies in BSB's adherence to the requirements imposed on it as an employer by the CBA, Policy 302, and, therefore, in BSB's decision to terminate Staton because she was unfit for duty. Staton was and is entitled to the rights conferred on her by these requirements just as BSB, as the employer, is obligated to follow them. Our decision here, like the initial arbitration award, rests on the same grounds as *Livingston*: The employer must make a credible finding of unfitness for duty and comply with the bargained for methods of termination should that evaluation show the officer is unable to comply with baseline mental health standards established by statute. Although Staton must be returned to employment under McCoy's award, BSB is not required to place an unfit officer on duty. If BSB believes Staton continues to be unfit, then it must pursue an appropriate fitness evaluation, place Staton on administrative leave pending the outcome of the evaluation, ensure that Staton has been offered rehabilitative strategies if the evaluation concludes she is unfit, and that the rehabilitative strategies have been unsuccessful. McCoy's award does not require BSB to place an unfit officer on the streets; rather, it requires BSB to follow the CBA prior to terminating an officer.

¶39 Finally, we note that if a police department were unilaterally able to declare, pursuant to the provisions of § 7-32-303(2)(g), MCA, that an officer was unfit for duty without providing the rehabilitative remedies negotiated and bargained for in a collective bargaining agreement and thereby ensuring that an unfit officer was not on the streets, a significant provision of the collective bargaining agreement would have no force or effect. Undisputedly, officers are on the front line of defense and experience significant trauma,

often daily. The CBA, here, allowed for an officer to seek rehabilitation services while remaining within the employment of the BPA and not on active duty. The provisions of Section 7-32-303(2)(g), MCA, must be read consistent with the CBA. The provisions of the CBA encourage an officer to seek help. Here, the CBA was negotiated and an agreement was reached regarding how an officer was to be treated when experiencing mental trauma or mental health issues, which did not violate the provisions of § 7-32-303(2)(g), MCA. Thus, we can uphold both the CBA's commitment to an officer's mental health and the requirements of the law, and we will do so.

¶40 Having determined that the arbitrator's award comports with Montana law governing qualifications for peace officers and is reasonably derived from the CBA between BSB and BPPA, we now turn to whether Montana's Uniform Arbitration Act permitted the District Court to remand the matter back to the arbitrator to "fashion an appropriate remedy" based on the perceived impossibility of complying with § 7-32-303, MCA, and the arbitrator's order for BSB to reinstate Staton. We conclude that the District Court abused its discretion by remanding to the arbitrator.

¶41 This Court has "emphasized that the scope of judicial review of an arbitration award is strictly limited to the statutory provisions governing arbitration." *Livingston*, ¶ 10 (citations omitted). The statutory provisions governing a district court's review of arbitration awards provide for the authority to confirm, vacate, modify, or correct. "Upon the application of a party, the district court *shall confirm* an award unless . . . grounds are urged for vacating, modifying, or correcting the award, in which case the court *shall*

*proceed* as provided in 27-5-312 and 27-5-313."   Section 27-5-311, MCA (emphasis

added).   Pursuant to § 27-5-211, MCA, a district court may *vacate* an award, upon

application of a party, if:

> (a) the award was procured by corruption, fraud, or other undue means;
> (b) there was evident partiality by an arbitrator appointed as a neutral or
> corruption in any of the arbitrators or misconduct prejudicing the rights of
> any party;
> (c) the arbitrator exceeded their powers;
> (d) the arbitrators refused to postpone the hearing upon sufficient cause being
> shown . . . ;
> (e) There was no arbitration agreement . . . .

Section 27-5-312, MCA.   Additionally, a court may not vacate a portion of an arbitration

award.  *Colstrip Energy Ltd. Partnership v. Northwestern Corp.*, 2011 MT 99, ¶ 26, 360

Mont. 298, 253 P.3d 870; *Dick Anderson Construction, Inc. v. Monroe Construction

Company, L.L.C.*, 2009 MT 416, ¶ 34, 353 Mont. 534, 221 P.3d 675.   Pursuant to

§ 27-5-313, MCA, the district court *shall modify or correct* an award only upon the

following circumstances:

> (a) there was evident miscalculation of figures or evident mistake in the
> description of any person, thing, or property referred to in the award;
> (b) the arbitrators awarded upon a matter not submitted to them and the award
> may be corrected without affecting the merits of the decision upon the issues
> submitted; or
> (c) the award is imperfect in a matter of form not affecting the merits of the
> controversy.

Section 27-5-313(1)(a)-(c), MCA.  This Court has previously held that the arbitrator of a

labor dispute "was without statutory authority to make substantive changes to the original

award" on remand from the District Court because such an action was outside the "statutory

bases set forth in §§ 27-5-312 and -313, MCA."  *Nelson v. Livingston Rebuilt Center, Inc.*,

22

1999 MT 116, ¶¶ 13-14, 294 Mont. 408, 981 P.2d 1185. There, the district court erred by remanding a matter back to the arbitrator to make substantive changes to the original award, vastly exceeding the narrow scope of review permitted by statute. *Nelson*, ¶ 13.

¶42 Here, the District Court abused its discretion in issuing relief outside the statutory bases for review of arbitration awards. In doing so, the District Court relied on Patenaude's IME, a finding of fact outside the scope of McCoy's opinion. McCoy specifically ordered further evaluations of Staton. Incorporation of that evaluation into Staton's case properly belonged to the Arbitrator, who retained jurisdiction over the implementation of the award at the stipulation of both parties. Under McCoy's original award, BSB would still need to comply with the CBA and associated employment policies governing termination should a subsequent mental health evaluation sufficiently demonstrate Staton's current and future inability to perform her job duties due to mental illness. Patenaude's IME "was not a Fit for Duty evaluation." Regardless, it is neither the province of the District Court nor this Court to supplement the record by weighing this new evidence. McCoy's decision turned on two key points: Watson's FFDE was too unreliable to support a finding that Staton was unfit for duty and BSB had failed to follow critical procedures to determine her fitness for duty in terminating her employment and assisting Staton with rehabilitation. The District Court's concerns regarding Staton's "inability to return to service" requires a factual determination which can only be made by Arbitrator McCoy. Consistent with the Arbitrator's award, Staton could be returned to duty with all rights as an employee of BSB and placed on administrative leave, thus avoiding a violation of § 7-32-303(2)(g), MCA,

23

while BSB must abide by the provisions of the CBA governing the termination of employees. McCoy's award did not foreclose such a process. During oral arguments below, Staton's attorney expressed the same: "There's nothing that prevents [BSB] from taking her back, putting her on administrative leave and doing another fitness for duty evaluation, only this time going to someone who maybe knows what they're doing." Accordingly, the District Court erred in improperly modifying Arbitrator McCoy's award.

## CONCLUSION

¶43    Having concluded that Arbitrator McCoy's award complies with Montana law and does not violate an explicit public policy, we agree the District Court did not abuse its discretion when it refused to vacate the award pursuant to BSB's Rule 60(b) motion. However, the District Court's remand to the arbitrator was an abuse of discretion because it exceeded the scope of permissible review of arbitration awards. An abuse of discretion occurs if the court makes a conclusion contrary to the law. *In re Bessette*, ¶ 13. As such, we reverse the District Court's order and remand with instructions to confirm the original arbitration award.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JENNIFER B. LINT
District Court Judge Jennifer B. Lint
sitting for Justice James Jeremiah Shea

24

Justice Jim Rice, dissenting.

¶44     The statutes governing this dispute provide as follows:

(2) [A person authorized by law to appoint peace officers] may not appoint a person as a peace officer who does not meet the qualifications provided in this subsection (2) plus any additional qualifying standards for employment promulgated by the Montana public safety officer standards and training council established in 2-15-2029.  A peace officer must:

(g) be free of any mental condition that might adversely affect performance of the duties of a peace officer, as determined after:

(i) a mental health evaluation performed by a licensed physician or a mental health professional who is licensed by the state under Title 37. . . ; or

(ii) satisfactory completion of a standardized mental health evaluation instrument determined by the employing authority to be sufficient to examine for any mental conditions within the meaning of this subsection (2)(g), if the instrument is scored by a licensed physician or a mental health professional acting within the scope of the person's licensure by a state;

(5) It is the duty of an appointing authority in Montana to ensure that each peace officer appointed under its authority . . . [meets] all other requirements of peace officer certification promulgated by the Montana public safety officer standards and training council.  Any peace officer appointed after September 30, 1983, who fails to meet the minimum requirements as set forth in subsection (2) . . . forfeits the position, authority, and arrest powers accorded a peace officer in this state.

Section 7-32-303, MCA (2019).

Appointing authority responsible for applying standards.  It is the responsibility of a public safety officer's appointing authority to apply the employment standards and training criteria established by the [public safety officer standards and training council] pursuant to this part, including but not limited to requiring the successful completion of minimum training standards . . . and terminating the employment of a public safety officer for failure to meet the minimum standards established by the council pursuant to this part.

25

Section 44-4-404, MCA (2019).[1]

¶45 As a threshold matter, and the point from which the Arbitrator began his analysis, the Arbitrator considered these statutes but concluded that they "didn't fit the facts" because "it is more likely that Detective Staton looked to the [CBA] and any other specific work rules imposed on the bargaining unit by the Employer as the source of the terms and conditions of employment." Consequently, the Arbitrator reasoned that Officer Staton could only be terminated if she had "violated the CBA or some other workplace rule." Thus, in my view, the Arbitrator considered but discarded the controlling statutes, setting a course in the wrong direction and never corrected, leading to his order that BSB must "immediately reinstate Detective Staton," "restore all of Detective Staton's rights associated with her status as detective including the right to elect to return to the patrol division should she choose to do so," "provide an evaluation of Detective Staton's psychological and mental health in an effort to determine what rehabilitative strategies might be available to her," and "[i]n short, [BSB] must make every effort to assist Detective Staton through her difficult psychological and emotional challenges." In my view, the Arbitrator manifestly disregarded the law in a manner that satisfies the narrow statutory grounds for vacating an award, § 27-5-312(1)(b), MCA, including reaching the essential conclusion that the standards of the CBA process could replace or supersede the requirements and duties of the statutes, and entered an order inconsistent with the law. The

---

[1] The Court cites, Opinion, ¶ 31, to the 2023 version of subsection (3) of § 44-4-403, MCA, governing revocation of a public safety officer's certification based upon mental illness, but that provision was not enacted until after this case was decided. It was effective October 1, 2023. Chapter 544, Laws of Montana (2023).

District Court recognized the illegality of the Arbitrator's remedy and remanded the case for the Arbitrator to come up with something different. Whatever that may turn out to be, I believe further process is unnecessary because the entire award was likewise illegally premised. The law forbids Officer Staton's employment as an officer and requires termination on this record. The suggested rehabilitative pathway has already been explored, and the case will inevitably come back to the same conclusion: under the law, BSB cannot allow Officer Staton to remain on the police force.

¶46 BSB correctly explains that it is undisputed that Officer Staton "does not meet, and has not met" the qualifications for a Montana law enforcement officer, pointing out that Officer Staton has admitted several times throughout the process that she is not fit for duty. Dr. Watson concluded Officer Staton was not fit for duty after his FFDE. Dr. Nicoletti, BPPA's expert, testified that BSB had procedurally erred in the process of implementing an FFDE, but nonetheless agreed that, based upon the results of Officer Staton's psychological testing, she was not fit for duty. After BSB filed its application to vacate the arbitration award, it arranged for a mutually agreed-upon independent medical evaluation of Officer Staton by a clinical neuropsychologist, Dr. Patenaude, who concluded thereafter he could offer no recommendations for rehabilitative strategies that might be available to Officer Staton to help her meet the qualifications. BPPA does not dispute that Officer Staton is unfit for duty; it argues only that the Arbitrator's decisions, including rejection of Dr. Watson's evaluation, should be deferred to, and that BSB should have done more to assist Officer Staton.

27

¶47 The Arbitrator was clearly free to reject the conclusion of Dr. Watson's FFDE, and he did so, on the basis of his criticisms about Dr. Watson's assumptions and methodology. *See* Opinion, ¶¶ 15, 27, 37. However, while Dr. Watson's assumptions were rejected, his psychological testing of Officer Staton remained, and was relied upon by Dr. Nicoletti in his testimony. As BSB argues, while the Arbitrator rejected Dr. Watson's fitness evaluation, "this does not change the fact that Staton's psychological test results confirmed what she already knew—she was not fit for duty." Under the statute, psychological testing is an alternative basis on which to make the requisite determination that an officer is "free of any mental condition that might adversely affect performance of the duties of a peace officer." Section 7-32-303(2)(g)(ii), MCA. Even the Arbitrator found that Officer Staton's testing "on the PAI and MMPI indicated she was emotionally unstable." I thus disagree with the Court that the Arbitrator's rejection of Dr. Watson's FFDE left "no other evidence establishing good cause as required" to terminate Staton. Opinion, ¶ 37. The entirety of the remaining evidentiary record demonstrated that Officer Staton was undisputably unfit for duty.

¶48 The Court reasons that compliance with the CBA was "precisely the question" before the Arbitrator, Opinion, ¶ 36, but if compliance with the CBA was the precise question, there would have been no need for the Arbitrator to reach and reject Dr. Watson's FFDE, an issue that goes to the merits. Instead, the Arbitrator would have concluded that Dr. Watson's FFDE should be taken up and considered in a remand to follow what he believed to be the correct process under Policy Number 302, but he did not. Rather, he ruled on the merits and addressed the evidence, including the FFDE. If this case was about

28

process, the Arbitrator would not have held that Officer Staton could not be terminated unless she had "violated the CBA or some other workplace rule," because the merits of her termination for unfitness would not have been the Arbitrator's concern. BSB's position in the arbitration was that the "grievance should be denied because just cause existed for Staton's termination." The Arbitrator applied what he described without citation to authority as the "well-known Seven Tests of Just Cause," which is a merits analysis that considers whether the employee had notice of workplace policy, knew her responsibilities under the workplace policy, the workplace policy was reasonable, the investigation was fair, any discipline was non-discriminatory, any discipline was appropriate, and whether there were mitigating circumstances to deviate from a discharge decision. The inconsistency with the Arbitrator's just cause test and the statutes is clear: BSB did not have flexibility to deviate from statutory requirements.

¶49 I believe the Arbitrator's collective rulings illustrate that his ultimate decision was entered for the purpose of obtaining rehabilitation for Officer Staton (ordering BSB to "immediately reinstate Detective Staton"; "provide an evaluation of Detective Staton's psychological and mental health in an effort to determine what rehabilitative strategies might be available to her"; "[i]n short, [BSB] must make every effort to assist Detective Staton through her difficult psychological and emotional challenges."). However, this constitutes "evident partiality" under § 27-5-312, MCA, because the order was entered in manifest disregard to the law, which places legal burdens or "responsibility" upon BSB to "ensure" that officers satisfy fitness standards, § 7-32-303, MCA, and to "terminat[e] the employment" of an officer who does not. Section 44-4-404, MCA. An officer who does

not satisfy the standards "forfeits the position." Section 7-32-303, MCA. Contrary to the Arbitrator's conclusion that the statutes "don't fit the facts," they fit exactly, and should not be ignored. The factual record in this case is undisputed that Officer Staton is not fit for duty, with or without Dr. Watson's FFDE. If the clear law is applied, the only result that can be reached upon the record is that Officer Staton cannot be reinstated to the police force. The Court reasons that placing an officer who has been shown to be unfit for duty on administrative leave is not inconsistent with the statute, because it "does not require BSB to place an unfit officer on the streets." Opinion, ¶ 38. However, while the applicable CBA process must certainly be followed, § 7-32-4164, MCA, thereafter, and upon a determination of unfitness, the statutes do not permit an exception from statutory requirements by keeping an unfit officer on the force but "off the streets."

¶50    Process is indeed important, and should have been adhered to more closely. But Policy Number 302 provides that "[t]he Sheriff may order a physical or psychological (fitness for duty) evaluation of the employee if there is any doubt concerning the employee's ability to perform the full duties of the position," and that "[t]he *Sheriff will normally decide* if an employee has a temporary or permanent physical or psychological condition that does not permit the employee's full performance of that duty." (Emphasis added.) The Policy continues by providing that a board, consisting of the Sheriff, Undersheriff, Captains, and the BSB Personnel Director, will consider the "available information" and make a final decision. Notably, the record reflects that the membership of the board were participants in ongoing conversations about Officer Staton's status, although they did not formally meet as a board to render a decision. However, on this

30

record, and on this law, I believe that further evaluation of Officer Staton's fitness will be meaningless and a futile act. Rehabilitation has already been evaluated and rejected. I believe a decision on the merits of just cause was rendered, contrary to controlling statutes. The law does not require further idle acts in response. Section 1-3-223, MCA.[2]

¶51 There is no disagreement that the Arbitrator's decision was contrary to law, only to what extent. I would conclude that the disregard of the law extended to the merits of the award. I would reverse and vacate the arbitration award in favor of Officer Staton.

/S/ JIM RICE

Chief Justice McGrath and Justice Sandefur join in the dissenting Opinion of Justice Rice.

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR

---

[2] The BPPA and the Court, Opinion, ¶ 32, rely on our decision in *Livingston*. However, there the District Court vacated the arbitrator's award on the ground it conflicted with "public policy" concerns, despite the award allowing the City to comply with its statutory obligation to ensure officers met employment qualifications. Here, in contrast, the award conflicts with BSB's statutory obligations and cannot be implemented consistent with statute.